Grant Kendrick is here for the Appellant Carrier, Dinah Stein is here for Jest and Hyman, and Appley Leninger and Robert George is here for Appley-Magle. Mr. Kendrick, you may begin your argument. Thank you, Your Honor. Grant Kendrick on behalf of the estate of Doris Hadcock here with my colleague Victoria McLaughlin. There are two categories of issues on appeal here that we can broadly separate the issues down into. One is based on what needs to be reviewed de novo with respect to error in the court's application of Florida Statute 825-103 with regard to the elder abuse claims that was raised by the estate. The court entered a directed verdict on all of those claims against all of the defendants, and the predicate for that directed verdict was that the court determined that actual damages meant only non-economic damages, and that's error, and I'll address that more precisely. Can we start there, because there's a lot of issues and you don't have a lot of time. Yes, absolutely. You want to start somewhere else? No, no, no, we can start there. All right, you brought that up first, so that's why I'm asking. All right, so let's say I agree with you on the actual damages issue. There still are some other reasons, though, that were proffered for why the district court should have granted judgment as a matter of law, and those also are argued to us and so are well preserved and we could rule on those. So, for instance, with regard to Somerset, so the claim, the elder abuse claim with regard to Somerset, as I understand it, this is predicated on some employees of Somerset, including the principal, giving money for those employees to buy furniture that was then used at Somerset, right? That's part of it, correct? That's as I understand the claim, and so that happened, as I understand it, eight months after the plaintiff here, the deceased plaintiff, was no longer at Somerset. She was already in New York living with the Carrier family. So, how is it possible that they were in a business relationship or position of trust, which is what's required under the statute, as I understand it, where this happened eight months later and where full value was given for, and I think even your expert conceded that full value was given for the furniture and things that were bought. So, with respect to Somerset and Ms. Hyman, the court is correct that their involvement with respect to Ms. Hadcock's guardianship persisted after her departure from the assisted living facility. I would like to be clear, though, that with respect to the exploitation claims, the court ruled that we could not pursue any exploitation claims during the time period when she was at the facility. We disagreed with that. We believe that there was elder exploitation at the facility. Now, under 772.11, the court determined that when they're at the facility, that's off-limits. We disagree with that because... No, but that's not on appeal to us. Well, we... Tell me where in your brief you raised that argument. You've just said that you disagreed. The district court ruled on that basis and you disagreed with that and that's what you're appealing to us. I believe that we are arguing that, one, that things that occurred in terms of exploitation were not limited solely to after the fact. With respect to the after her departure, there was still a business relationship between Ms. Hadcock and the, let's call them the Somerset defendants, and the reason for this is because they were still a creditor of Ms. Hadcock. They were transacting in those very transactions with respect to Ms. Hadcock's property and they even... The billing is done. The creditor relationship is done. It's just, are you gonna pay the bill or not? I mean, that's not a business relationship, is it? In other words, they're not partners. There's no contract between them. In fact, that's the basis of one of your claims. There's no contract between them. They're just, they billed for services. Those bills remain pending eight months. They remain pending three years later until it was eventually paid by the court. I just, I'm having a hard time seeing how that's a business relationship as understood by Florida law. So our position is that the transactions that occurred involved Doris's property, it involved Doris's assets, and those transactions are a business relationship. That's our position. Can I, may I ask a question about the breach of fiduciary duty? Because I'm kind of interested in those. I wanted to talk about the exclusion of the evidence relating to the husband's probate. The district court judge made the determination to exclude you from raising that evidence, correct? Yes. All number one, that the Haddox had a will. Correct. Right, so there was really no need to probate anything, but, and that she was the sole heir to her husband's estate. Precisely. And that he died in 2016, and the assets that were in that estate, which should have transferred completely to the sole heir, which was that not allowed to be used for purposes of a breach of fiduciary duty or the professional negligence claim against the guardian, and who was also the professional, was also the PR for the husband's estate? Right. The rationale that the court stated in terms of its ruling was that it was not relevant, and we of course disagree with that. How is it not relevant when those assets should have gone to the sole heir, which was Mrs. Haddox, okay? And she should have been, since the Leninger was acting as her guardian, you're supposed to pay your, the assets or whatever expenses you have for the guardianship. Yes. And I believe that from what I could see in the record, there was only, the creditor was Somerset, and they refused to pay the funeral expenses for the husband. Right. So I completely agree with your honor. That should not have been excluded. What did you tell, what actions did you tell the district court? So with regard to the question that Judge Legault asked, so about the probated estate, there was a colloquy between you and the district court about this. It's at a docket entry 423, spanning about 15 pages or so, starting at about 124 or so. And there, the district court has some very specific questions, and it asked you, what property are you saying, as part of the probated estate, did they use the guardianship, I'm sorry, did they use the probated estate to subvert the guardianship? Because that was your claim, right? Your point was they were using it to subvert the probate, the guardianship by going through the probate, right? Part of it, yes. I'll read to you why you need it. We have been clear that one of the issues in this case was the way Miss Leninger and Miss Nagel used the probate proceedings in order to circumvent getting an order from the guardianship court. You repeat that exact thing in your brief to us. Yes, your honor. That's the basis in which you told the district court why you needed the evidence, right? Right, so the key word there is circumvent. Okay, so let's talk about that. Then the district court said, what property are you talking about? And you answered, or it was you, you answered. So I'll explain the sales. The property that is likely Mr. Haddock's property is the property in Florida called Burrell Avenue. That property was sold by the defendants on the day that individual property. And then the court says, wait a minute, the day he passed away, that's before the state was probated. How is that relevant to there? And so what the court there said is because that was before the estate was even created, that sale, that cannot possibly be used to circumvent the guardianship, right? That's what happened, right? I disagree with that assessment. Tell me where. I'm looking at the transcript. Show me where. No, no, I'm not disagreeing with is that the funds from that sale went into Mr. Haddock's estate. And the reason that that evidence was important was because the estate had... District court excluded it because the sale happened before the the probate even happened. I mean, it takes some time for you to even file a will with the probate court for the probate going to a point to give letters of credit to the It takes time. And the sale happened well before all of that, right? The sale did happen before with that property. It did happen before he passed. But the assets were not distributed until 2018. Right, several years later. And she was forced to dissipate her own assets even though those assets from her husband's estate were now her assets. Not only that, but also this was used as a justification with respect to the assets that were in the probate estate was used as a justification not to provide support to Doris in New York. It wasn't... They only gave her, didn't they actually just give her $18,000 lump sum? Which I don't even understand because if you're a guardian and you have a, you are the guardian for a guardianship, you are responsible for making sure the guardian is taken care of. And you are responsible for paying for any and all for the guardianship. So I don't even understand how an order was entered that she would only get $18,000 period, end of story. Your Honor, 100% agree with you. I'm over my time. You can keep going. This is... Okay, so I totally agree. It's very important and I understand what Judge Luck, your argument is with respect... No, I don't have an argument. I merely read a transcript that Judge Moody very carefully articulated the reasons why he found this evidence not to be relevant. And that's because you pointed to a sale, not proceeds, a sale that was relevant for circumventing the guardianship. And he merely pointed out and ruled on that ground that that sale happened well before a probate estate there. So that probate estate couldn't be used to subvert the guardianship. How is that different? Perhaps this is... I'm viewing this differently. The evidence that we were seeking to admit was things that were filed in the probate. What thing? And let me tell you... Counsel, counsel, counsel, counsel, counsel, counsel. I've read the entire trial transcript. This was a frustration that the district court had with you personally throughout. And that is you would say broadly things and when asked for specifics, there were very few of them. And this was one of those instances. So the court, you said, we want to get into the probate estate because it was used to subvert. Well, how? It was just used because of property. Well, what property? And then when the rubber met the road, the only thing you mentioned was a Florida house that had been sold prior to the creation of the probate estate and two New York properties, which you stated to the, which you proffered to the district court, was more of the same. And that was it, right? We proffered... Is anything I just said incorrect? In terms of your... Is anything I just said incorrect about what happened at trial? In terms of what was stated, no, that's not incorrect. But we did proffer the records, including the inventory, and we invited the court on the record to review the inventory. And the importance of it was, Joe, and the court had this, and we also briefed this issue on motions in limine. So it wasn't just what was argued at trial. But we, the point of this was that she had a lot more money coming her way that the jury was never able to hear about. And it allowed the defendants to essentially say, no, we're not breaching our fiduciary duty, not acting against the best interest of the ward because there's no money to give her. She doesn't have anything. I think I might agree with you that if the evidence was relevant, it seems as if the judge was concerned about having evidence with regard to the husband's estate leading into this case. And so, I actually agree with you that the evidence of the handling or mishandling of the husband's estate might have a more or less probable. So I think the evidence was probably relevant, but the problem that I have is whether or not the exclusion of the evidence was harmful. May I address that, Your Honor? I'm over time. Tell me how it would have changed the outcome of the case. Here's how it would have changed the outcome. The claims that we lost, breaching fiduciary duty, professional malpractice, all of Doris' assets were held up for a three-year period for no reason. And the jury wasn't able to hear about all this money that was being held back from her provision of support. It undermined our expert's ability to testify in terms of the fact that there were funds. And the jury was left with the impression that nothing from nothing is nothing. Doris didn't have anything. And that isn't really true. That wasn't what was going on. You can't get anything from a stone. So at this point, they were under the impression that there wasn't anything in the estate to begin with, other than what was given out in, I guess, 2018 or whatever it was, which was like thirty-something thousand dollars and that's it. But there was definitely more at the time. Yes, and a lot more. And so, I do think that that was very prejudicial. And the other thing was, one of the themes of the defendants was, not a single penny unaccounted for. Not a single penny. And that evidence mitigates against that statement and we didn't get to bring it out. Let me ask you, as far as the elder exploitation claim against Somerset, don't the Florida statutes make it clear that you can't impose liability on a licensed residential care facility? During provision of treatment or care, and we would dispute that the acts that they took in terms of her confinement constitute treatment or care. I mean, there are things that happened in this facility that go far beyond what would be contemplated as what would happen at an assisted-living facility. If you're in an ALF and you say, I want to go. I understand. I understand your argument. You've reserved some time for rebuttal. Thank you, Your Honor. Ms. Stein, on behalf of Just and Hyman. May it please the court, Diana Stein, on behalf of Just Operating and understanding that our clients are somewhat disparately situated. I plan to address the directed verdict issues and to the extent there are any issues with the evidence that was excluded regarding Neal Haddock's residency, which was not addressed by counsel, and then I'll see the remaining time for the issues that pertain to the other defendants. But, you know, starting with the directed verdict issues, and this really is, there's such a disconnect between what has been conceded below, what is being raised on appeal. I will start with the premise on the elder exploitation. The court narrowed it down in the beginning of this very robust discussion at the directed verdict motions to, I've narrowed it down, he literally said on the record, to the estate sale. There's no argument from plaintiff that that's wrong. They just went along with it, and in fact, there was a very detailed discussion between Judge Moody and plaintiff's counsel regarding what are damages, how do you define damages under the statute, where plaintiff's counsel all but conceded that it is actual damages, meaning monetary. So, you know, this was the discussion held below, and then the discussion went to, well, where's the evidence of the value of the issue? So it was a number of things that the court correctly addressed with counsel below and ruled on. Number one, this is an ALF, so under the statute, they can't be liable for what happened while Shelley was there. She is now eight months out. There is no business relationship between Somerset and, of course, there was never a business relationship with Ms. Hyman. They go to a estate sale that is court-approved. They are arm's-length transactions. They come in there. There was never any evidence that any of the sales were for anything more than fair market value established by a third party company approved by the court. It is no different than if a person came off the street and purchased from that estate sale. They couldn't be liable for elder defendants here. So there's no error. There's no abuse of discretion. There's no plain error on that. That was the correct ruling. Plaintiff, you know, has raised a number of directed verdict points on appeal, just neglects to tell the court that all of those claims went to the jury. The negligence claim went to the jury, and they prevailed against Somerset, yet they raise alleged errors that occurred below. They are profoundly harmless. They complain about rulings made as to, I guess, intentional infliction of emotional distress and false imprisonment. All of those issues went to the jury. The jury found against them, so they are non-issues. The directed verdict motions and rulings were just so limited, and plaintiff has not shown any error. You know, I don't know how much, you know, more I could get into that. These were just financial torts, and plaintiff, even though she, we got the directed verdict on the contract not being given to her, the jury gave all of the damages that plaintiff said flowed from not presenting Ms. Haddock with a contract. Why aren't Leninger and Nagles Rose as personal representatives of Neal's estate inextricably linked to their fiduciary duties to Doris? Thank you, Judge Wilson. Because that issue does not affect Somerset and Hyman, if it pleases the court, I am going to allow counsel to address that. I don't think in we stayed out of that. If your honors have more questions regarding the directed verdict issues, elder exploitation, or, you know, the Neal sitting in a chair evidence and bingo, I would like to address those, but they were not brought up by counsel. So if it pleases the court, I will allow my honors. Thank you, Ms. Stein. Mr. Smith. Good morning. Philip Smith for Patricia Leninger. May it please the court. So we are here to discuss the error that has been alleged by the appellant, and I think there was some concerns with regards to Neal Hadcock's probate by this panel. So I want to dive right into that, and the first thing to keep in mind was Neal Hadcock, prior to his death, had his own guardian, a lady by the name of Ann Varner. Ms. Varner was not a defendant in this case. But your client became the PR for Mr. Haddock's estate because she was serving as the guardian for the wife, correct? By way of the guardianship, that's right. Right. My concern is that the probate of Mr. Haddock's estate, and I don't see how that was appropriate or proper, and I speak for myself only, because obviously when you read the record, you'll see that there's a lot of testimony about the fact that Ms. Haddock had to live, didn't have any money to live after 2016, when her husband had all the assets from that estate passed completely to her because she was the sole heir. So I don't understand how that was not relevant, that for two years she had to live and depend on the kindness of the carriers to house her, to feed her, and to pay for her medical needs. It was not paid for by the guardian, your client. So let me address that directly. The first thing to understand is if you look at the supplemental record that was supplied by counsel, you'll see what assets Mr. Haddock had, and you'll see that they did in fact have to be record from Somerset. Somerset had a $50-some-thousand bill. You also had testimony from other people who said that as a guardian they would pay for any and all expenses of the ward before they would pay a creditor. This is an unsecured creditor. This is not the government and you're not paying a tax lien or you're not paying anything like that. Yes, I understand, but understand the $18,000 at some point, that's all she was given, and she had nothing else given to her even though she was a sole heir of her husband's estate, and that was not allowed to be presented to the jury. That there was property, there were bank accounts, and there were other things that could have been distributed to her to pay for her. If the carriers had not taken her, she would be out on the street because there was no place for her to live because she look at this record and the really good way to see this entire case is take a look at document 384-59. This document is a complete accounting of this entire matter together with dates and everything that happened in the guardianship, and keep in mind that Neil Hadcock's probate estate was entirely separate, and he had to settle his own affairs, and that was done first. Then those monies flowed through to the guardianship, and you can see in this document 384-69, there were no creditors other than Somerset. There were two creditors for that estate, Somerset and then the carriers who asked for the funeral expenses of $1,700 something dollars to be paid for. What other creditors? Those were the creditors. That was it. Right. And then took almost three years to 2018 for it to be fully probated. There was also real property and things that had to be probated. In that time, Ms. Doris Hadcock did not have any money and was not given money. Well, the question of whether she was getting money... So how is that not appropriate for the jury to hear that, that the fact that of what happened with that she wasn't getting money? If you take a look at 384-69, you can see everything that was paid on her behalf. Her insurances, her medical supplies, everything that she needed was paid directly to the vendors. The difference and what the appellants would have you believe is she never got any money. That's simply not true. She didn't get money directly to her. She got paid, all of her vendors and things she needed got paid by the Guardian. Take a look at that document. Did the Guardian try to give her direct money on a monthly payment? Absolutely not. What happened to that? The Guardian tried to give her money directly, filed a petition with the court. The auditors said yes, but then the court on its own accord issued an order, and that can be found at 384, I think, 54, the court denied the Guardian the ability to give money directly to Mrs. Hadcock. So to say she wasn't getting money is not accurate. The accuracy would be she wasn't getting cash to herself, but that was denied by the lower court. The Guardian couldn't do that, but if you look at 384, 69, you'll clearly see all of the items that were paid on her behalf. Real estate taxes and so forth. I see that I'm out of time. I will yield to my colleague. Thank you, Mr. Smith. We'll hear from Mr. George on behalf of Nagel. Yes, Your Honor. Robert George on behalf of our Meredith Nagel, PA. If you would like, I'll also jump right in to the issue of Neal Hadcock's estate, because I do think it's very important to note that during the guardianship process, Ms. Carrier and Ms. Hadcock, they were both represented by counsel for most of that process. Ms. Hadcock had her own lawyer, so when the issues of these expenses being paid were addressed, these were heavily litigated. Again, my counsel represented Ms. Leininger. To protect Ms. Leininger, they made sure all these expenses that were paid or were not paid were brought before the court, were litigated on behalf of the Guardian and on behalf of the ward with counsel, and they did exactly what the court or not to pay other expenses. If Miss Carrier or Miss Hadcock had disagreed with that, they could have appealed those orders. They did not. Miss Carrier's own expert in this case acknowledged you have to do with that trial court or that guardianship court tells you to do or appeal it. They did not appeal it. So, as it relates to going back to what Mr. Smith testified, there's no evidence of any dollars not being paid to Miss Carrier. Dollar for dollar, everything was paid. I think that that kind of goes to the prejudice of the exclusion of Neil Hadcock's estate. The testimony regarding that is because there was no evidence presented at trial ever that she did not receive full value of her own assets and of the assets from Neil Hadcock's estate. I also want to address the issue of relevance as it relates to Neil's Hadcock's estate. I think it's important to note that my client and Mr. Smith's clients, they were not sued in their capacity as the PR or the counsel for the PR. They were sued as their capacity and the guardian and the counsel for the guardian. Um, there are different standards for those two positions under florida law. You have after 7 33 of florida law represent or deals with the guardianship. 7 44 deals with the PR. Uh, there were, there was no expert testimony, uh, provided as it relates to this different standard. Uh, you know, like your honor acknowledged, there was a lot of assets that were sold prior to Mr. Smith's client and my client's involvement in Neil Hadcock's estate. On top of that, there's a separate state court action pending about Neil Hadcock's estate because of all these issues. I think it was appropriate for the trial judge to exclude this testimony. If nothing else, this, the jury is significant. And again, there's this no harm whatsoever because Miss Carrier could not identify $1 that she did not. Isn't one, isn't one of the allegations that was made is that Miss Haddock's property should not have been, um, sold because there were assets that she was to receive from her husband's estate. And as a result of the delay in processing that then her assets had to be dissipated. Her assets were, am I wrong? Isn't that one of the allegations? I think it might be one of the allegations. Again, the allegations are very broad and general and there's a lot thrown against the wall. But when you look at the specifics, we completely disagree with that. The piece of evidence that Mr. Smith identified goes through the amount of assets that she had in the bills that Miss Carrier had. I mean, the issue here is, is that when her husband passed away because she was a sole heir, uh, I guess under the will, there wasn't anything for the daughter to receive. She was the heir. I would so there really is a combination of what were her assets and their husband's assets. At this point, once he passes away, they're all her assets. Um, and the allegation is, is that whatever she had, she had to, they, they made her sell her property and other things, uh, when she had resources and didn't need to do that. Your honor, I disagree. In effect, Miss Carrier's own expert would the expert that they paid significant funds to testify on their behalf said that it was appropriate for Miss Hadcox assets to be sold at the time. Again, it was Miss Hadcock that decided to leave Somerset Somerset that was not charging her. She decided to leave at the time the guardianship was created. The guardianship court went ahead and already approved the expenses of the guardianship process. Miss Hadcock had no funds whatsoever to pay those bills. Assets had to be sold to pay those bills. Miss Carrier's own lawyer recognized and agreed with that. And that issue about whether those assets should be sold again, that was one of those issues that was heavily litigated. In fact, it was so heavily litigated that Miss Carrier's counsel even filed a motion for rehearing and which was denied. Not only was it denied, but the parties even agreed on a lot. These weren't counsel that were disagreeing. Miss Carrier's counsel along with my client, they they worked together to try to expedite this process as much as possible. This was just a heavily litigated issue or case, but they did what they could, whether it be as it to the order of guardianship, to the sale of assets. Thank you very much. Mr. Kendrick, you have reserved some time? You may. Let me just ask you with regard to the elder exploitation claim. The guardianship court ordered a sale. The funds were used to pay Doris Hanock's expenses. The fees that Leninger and Nagel got were approved by the guardianship court. So I'm having a hard time finding how there is a reasonable jury could find for Shelly on that. Your Honor, I agree with you completely and I think that that's why the is so important to the case because what the defendants were doing in the district court case was the same thing that they did in the guardianship case. They were able to present half of the story in terms of what was going on in order to justify what they're doing. And they're not insulated from liability if they're not telling the truth to the guardianship court about what's going on. And if they've got money behind their back, they tell the court. I guess some of this evidence that was excluded was relevant. But then for me, you have a pretty difficult standard of review when it comes to these evidentiary issues. You have to demonstrate that Judge Moody used his discretion. It's a pretty hard standard of review when it comes to the case that was presented to the jury. Yes. And I agree. Abusive discretion on the evidentiary issues, high standard. But if you look at the verdict, you look at the outcome, you look at the evidence that could have come in versus what did, and you think, how is a reasonable jury going to react to this information? The deprivation of evidence was so significant that we didn't have a fighting chance in terms of proving breach of fiduciary duty. We have to show they acted against her interests. And if we can't show that they had money that they had, and we can't show anything about what happened to her husband while he was at the facility to actually give a flavor for what was going on in this case, they made it, the jury came away with the opinion that this was just an elderly lady who was unhappy about being at a nursing home and didn't have any money. And that really isn't what this case was about. So the prejudice here in terms of our ability to prove our claims was overwhelming. If I were on this jury, I would have, I'd probably be more concerned. We had to show, we had to show that they acted against her interests. And we didn't, we weren't allowed to call witnesses that a witness, Catherine Strudel, who said we've been able to identify that the carrier's new relatives of Doris up in New York, and that they weren't exploiting her. All we had, Doris passed away during the trial, or before we went to trial. And so we didn't have anybody other than the person that the defendants are saying was the real exploiter to get up there and say, no, no, I'm not the real exploiter. We have your argument. Thank you. Thank you. Court is in recess until 9 o'clock tomorrow.